ROBERT W. FISCHER, JR. (Bar No. 57001)
SPENCER PERSSON (Bar No. 235054)
FULBRIGHT & JAWORSKI L.L.P.
555 South Flower Street,
Forty-First Floor
Los Angeles, CA 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
Email: rfischer@fulbright.com
        spersson@fulbright.com

Of Counsel:
FREDERICK R. ROBINSON
LESLEY REYNOLDS
CORI GOLDBERG
FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (212) 662-0200
Facsimile: (212) 662-4643
Email:    frobinson@fulbright.com
          lreynolds@fulbright.com
          cgoldberg@fulbright.com

Attorneys for Plaintiff
GORDIAN MEDICAL. INC.

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

SACV11-1566 JVS(JPRx)

| | |
|---|---|
| GORDIAN MEDICAL, INC., | ) Civil Action No. |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) |
| KATHLEEN SEBELIUS, Secretary of Department of Health and Human Services, | ) |
| | ) |
| Defendant. | ) |

1.      This is an action for judicial review of two final decisions by the Secretary of the United States Department of Health and Human Services ("HHS"), through the Medicare Appeals Council ("MAC"), Docket Number M-11-12 and

1    Docket Number M-11-146, (the "Final Decisions") to deny Plaintiff's claims for

2    Medicare reimbursement for medically necessary products provided to Medicare

3    beneficiaries.

4         2.       The total amount in controversy is approximately $1,722.000.

5         3.       Plaintiff is entitled to relief in this action pursuant to the Medicare Act,

6    42 U.S.C. § 405(g) and the Administrative Procedure Act ("APA"), 5 U.S.C.

7    §§ 551 et. seq., including without limitation 5 U.S.C. §§ 704 and 706.

8                         **JURISDICTION AND VENUE**

9         4.       The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  Plaintiff

10   also is entitled to relief in this matter pursuant to the Administrative Procedure Act,

11   5 U.S.C. § 551 et. seq., including without limitation 5 U.S.C. § 704.

12        5.       Venue is proper in this district pursuant to 42 U.S.C. § 405(g) and 28

13   U.S.C. § 1391(e).

14                               **PARTIES**

15        6.       Gordian Medical Inc., ("Gordian" or "Plaintiff") is a Nevada

16   Corporation.  Plaintiff has its principal place of business at 17595 Cartwright Road,

17   Irvine, California 92614-5847.  Plaintiff is the successor in interest to American

18   Medical Technologies, Inc. ("AMT").  At the time services were furnished to

19   beneficiaries, AMT was a supplier in good standing with the Medicare program.

20   AMT voluntarily surrendered its Medicare supplier number on August 8, 2008 and

21   is no longer a Medicare supplier.  Plaintiff Gordian has its own Medicare supplier

22   number and is in good standing with the Medicare program.

23        7.       Plaintiff furnishes Medicare beneficiaries with wound care supplies

24   through a delivery/shipping service.  Plaintiff furnishes wound care supplies which

25   are generally used as primary or secondary dressings on wounds to Medicare

26   beneficiaries throughout the country.

27

28

8.     Plaintiff maintains a nationwide staff of more than 150 nurses and physical therapists who have completed the required training and testing to be designated "Certified Wound Specialists" or similar certifications.

9.     Plaintiff is a licensed, bonded and accredited supplier of the Medicare program.

10.    Defendant Kathleen Sebelius is the Secretary of the Department of Health and Human Services.  In that capacity, she is responsible for the conduct and policies of HHS, including the conduct and policies of the Centers for Medicare and Medicaid Services ("CMS") and its contractors.  She is sued in her official capacity.

## THE MEDICARE PROGRAM

11.    The Medicare Act was established under Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 – 1395ggg, and provides payment for the provision of covered medical care services, equipment, and supplies to eligible aged and disabled persons.

12.    Part B of the Medicare Act, 42 U.S.C. §§ 1395j – 1395w-4, provides supplementary medical insurance for covered medical services and covered medical supplies, including Durable Medical Equipment, Prosthetics, Orthotics and Supplies ("DMEPOS").  Surgical dressings and/or wound care supplies are among the medical supplies that may qualify for coverage under Medicare Part B and are items of DMEPOS.

## MEDICARE COVERAGE - GENERALLY

13.    The Medicare statute and its implementing regulations establish conditions and limitations on the coverage of services, supplies and equipment, 42 U.S.C. §§ 1395k, 1395l, 1395x(s), as well as provide for exclusions from coverage. 42 U.S.C. §§ 1395y(a)(2)-(16); 42 C.F.R § 411.15(a)-(j).  Medicare coverage is limited to services and equipment that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

14.    Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person . . . unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person . . . for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e).

15.    Section 1834(a)(11)(B) of the Act and implementing regulations provide that a written physician order may be required by a supplier before delivering medical supplies.  *See* 42 U.S.C. § 1395m(a)(11)(B)(i); 42 C.F.R. § 410.36(b).

16.    Section 1835(a)(2)(B) of the Act and implementing regulations require that a physician certify the medical necessity of an item in writing.  *See* 42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. §§ 424.24(b) and (g).

17.    Section 1879 of the Act and implementing regulations provides that Medicare will pay for "custodial care" and "services not reasonable and necessary" if the following conditions are met, (a) the services were furnished by a provider or by a practitioner or supplier that had accepted assignment of benefits for those services; and (b) neither the beneficiary nor the provider, practitioner, or supplier, knew, or could reasonably have been expected to know, that the services were excluded from coverage under § 411.15(g) or (k).  *See* 42 U.S.C. § 1395pp; 42 C.F.R. § 411.400(a).

18.    A provider or supplier is considered to have notice that services are not covered if it is clear that they should have known of Medicare's coverage criteria based upon the receipt of notices from CMS or its agents, publication in the Federal Register, or based upon their "knowledge of what are considered acceptable standards of practice by the local medical community." 42 C.F.R. § 411.406(e).

19.    A supplier is liable for the amount of an item where the patient's medical record does not support medical necessity for such item, unless a properly

1  executed Advance Beneficiary Notice was obtained.   *See* Medicare Program

2  Integrity Manual, Pub. 100-08, Chapter 5, § 5.7.

3      20.   The Secretary employs various mechanisms to explain coverage and

4  exclusions from coverage.   For example, a national coverage determination

5  ("NCD") is "a determination by the Secretary with respect to whether or not a

6  particular item or service is covered nationally . . . but does not include a

7  determination of what code, if any, is assigned to a particular item or service

8  covered under this subchapter or a determination with respect to the amount of

9  payment made for a particular item or service so covered."   42 U.S.C.

10  § 1395ff(f)(1)(B).

11      21.   In addition, Medicare contractors may issue a "local coverage

12  determination" ("LCD"), which is a "determination by a fiscal intermediary or a

13  carrier under part A . . . or part B . . . respecting whether or not a particular item or

14  service is covered on an intermediary- or carrier-wide basis . . . ."   42 U.S.C.

15  § 1395ff(f)(2)(B).   Essentially, an LCD is a decision by a Medicare contractor

16  regarding whether a particular item or service falling within the contractor's

17  jurisdiction is covered as reasonable and medically necessary.   The final rule

18  establishing LCDs was published November 11, 2003.   *See* Medicare Program

19  Integrity Manual, Pub. 100-08, Chapter 13, § 13.1.3.

20      22.   A party can request review of an NCD or an LCD.   An NCD can be

21  reviewed by the Departmental Appeals Board ("DAB"), and an LCD may be

22  reviewed by an Administrative Law Judge ("ALJ").   The final decisions of the

23  DAB and the ALJ are subject to judicial review.   42 U.S.C. §§ 1395ff(f)(1) and (2);

24  42 C.F.R. Part 426, Subparts D and E.

25          **HCPCS CODING UNDER THE MEDICARE PROGRAM**

26      23.   Pursuant to Title II, subtitle F of the Health Insurance Portability and

27  Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-2, Congress required

28

1    the Secretary to adopt and implement standards and requirements for coding

2    systems to facilitate the electronic transmission of certain health information.

3        24.    On August 17, 2000, CMS published regulations (45 C.F.R.

4    § 162.1002) to implement the HIPAA requirement for standardized coding systems.

5    It established the Healthcare Common Procedure Coding System ("HCPCS") Level

6    II codes as the standardized coding system for describing and identifying health

7    care equipment and supplies in health care transactions that are not otherwise

8    identified by HCPCS Level I, CPT codes.    HCPCS is the means by which

9    DMEPOS items and services are identified for Medicare billing, among other

10    functions.

11        25.    During the relevant time period, the Statistical Analysis Durable

12    Medical Equipment Regional Carrier ("SADMERC") was a national entity that also

13    provided services under contract to, and was an agent of, CMS.[1]  The SADMERC

14    HCPCS Unit offered guidance to manufacturers and suppliers on the proper use of

15    the HCPCS.  Additionally, the SADMERC performed a variety of national pricing

16    functions for DMEPOS services, assisted CMS with the DMEPOS Fee Schedules,

17    and analyzed DMEPOS fees to identify unreasonable or excessive reimbursement

18    amounts.  CMS instructed manufacturers and suppliers to contact the SADMERC

19    HCPCS Unit to obtain proper billing codes for DMEPOS items and determination

20    of proper billing identification codes for new products or items.

21        26.    Medicare payment for DMEPOS items and services is currently based

22    on a fee schedule payment methodology, pursuant to section 1834 of the Act.  42

23    U.S.C. § 1395m.  The payment for surgical dressings under Part B is 80 percent of

24    the lesser of the actual charge for the item or the amount set by the fee schedule

---

[1]  The Pricing Data Analysis and Coding Contractor ("PDAC") replaced the SADMERC in August 2008 and generally performs the same functions under contract with CMS.  For purposes of this lawsuit, we will continue to refer to the entity as the SADMERC since that was the name of the entity during the relevant time period.

1   payment methodology. *Id.* Fee schedule payment amounts for DMEPOS are the

2   same for all items included in a HCPCS code, varying only slightly by geographic

3   area.

### MEDICARE PART B CLAIMS PROCESSING

5         27.   Claims for DMEPOS items and services are submitted to one of four

6   Durable Medical Equipment Medicare Administrative Contractors, commonly

7   referred to as "DME MACs" (formerly known as Durable Medical Equipment

8   Regional Carriers ("DMERCs")) that are agents of CMS.  The geographic

9   jurisdictions of the DME MACs are fixed by CMS and whether a claim falls under

10   their purview depends upon the residence of the Medicare beneficiary on whose

11   behalf a claim for payment is submitted. Pursuant to contracts between CMS and

12   the individual DME MACs, Medicare claims in this matter were processed by the

13   following DME MACs in their respective jurisdictions: (a) NHIC, Corp.; (b)

14   CIGNA Government Services; and (c) Noridian Government Services.

15         28.   In addition to DME MACs, Durable Medical Equipment Program

16   Safeguard Contractors ("DME PSCs") formerly contracted with CMS and helped

17   administer the Medicare program.  DME PSCs were responsible for creating

18   Medicare coverage guidelines, formulating LCDs (with CMS's approval), and

19   conducting medical review/utilization review of claims within their respective

20   jurisdictions. Effective March 1, 2008, however, DME PSCs no longer developed,

21   revised or recommended LCDs to the DME MACs.  *See* Medicare Program

22   Integrity Manual, Pub. 100-08, Chapter 13, § 13.1.4. The DME MACs have full

23   responsibility for developing and revising LCDs, maintaining the LCD record, and

24   for adjudicating LCD challenges. CMS requires that LCDs developed and revised

25   by the DME MACs be identical for each jurisdiction to ensure uniformity for

26   DMEPOS suppliers that operate nationally. *Id.*

27         29.   Medicare contractors, upon receipt and processing of a claim for

28   payment, make an "initial determination," deciding whether the items or services

that are the subject of the claim are covered, as well as the amount payable for such items or services. 42 U.S.C. § 1395ff(a)(1); 42 C.F.R § 405.920.

30.    The Medicare statute and implementing regulations provide an administrative appeal process for aggrieved parties who disagree with an initial determination. The following levels of review are available for claimants who are dissatisfied with any initial determination:

a)    <u>First Level of Appeal</u> - Redetermination by the contractor that processed the claim, (42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940);

b)    <u>Second Level of Appeal</u> - Reconsideration by a Qualified Independent Contractor ("QIC"), (42 U.S.C. §§ 1395ff(b)(1)(A) and (c); 42 C.F.R. § 405.960);

c)    <u>Third Level of Appeal</u> – Review by an Administrative Law Judge in the Office of Medicare Hearings and Appeals, (42 U.S.C. §§ 1395ff(b)(1)(A), (E) and (d)(1); 42 C.F.R. § 405.1002);

d)    <u>Fourth Level of Appeal</u> - Review by the Medicare Appeals Council, (42 U.S.C. §§ 1395ff(d)(2); 42 C.F.R. § 405.1100); and

e)    <u>Fifth Level of Appeal</u> – Judicial review in Federal District Court, (42 U.S.C. §§ 1395ff(b)(1)(A), (E); 42 C.F.R. § 405.1136).

## MEDICARE COVERAGE OF SURGICAL DRESSINGS

31.    There is no NCD for surgical dressings. However, each of the contractors listed above have issued an LCD for Surgical Dressings: (a) NHIC, Corp., LCD (L11471); (b) Noridian Government Services, LCD (L11460); and (c) CIGNA Government Services, LCD (L11449). These LCDs for Surgical Dressings are virtually identical.

32.    Medicare guidelines state, in relevant part, the following in regards to coverage of surgical dressings:

Surgical dressings are limited to primary and secondary dressings required for the treatment of a wound caused by, or treated

by, a surgical procedure that has been performed by a physician or other health care professional to the extent permissible under State law. In addition, surgical dressings required after debridement of a wound are also covered, irrespective of the type of debridement, as long as the debridement was reasonable and necessary and was performed by a health care professional acting within the scope of his/her legal authority when performing this function. Surgical dressings are covered for as long as they are medically necessary.

Primary dressings are therapeutic or protective coverings applied directly to wounds or lesions either on the skin or caused by an opening to the skin. Secondary dressing materials that serve a therapeutic or protective function and that are needed to secure a primary dressing are also covered. Items such as adhesive tape, roll gauze, bandages, and disposable compression material are examples of secondary dressings. Elastic stockings, support hose, foot coverings, leotards, knee supports, surgical leggings, gauntlets, and pressure garments for the arms and hands are examples of items that are not ordinarily covered as surgical dressings. Some items, such as transparent film, may be used as a primary or secondary dressing.

If a physician, certified nurse midwife, physician assistant, nurse practitioner, or clinical nurse specialist applies surgical dressings as part of a professional service that is billed to Medicare, the surgical dressings are considered incident to the professional services of the health care practitioner. (See §§60.1, 180, 190, 200, and 210.) When surgical dressings are not covered incident to the services of a health care practitioner and are obtained by the patient from a supplier (e.g., a drugstore, physician, or other health care practitioner that qualifies as a supplier) on an order from a physician

1      or other health care professional authorized under State law or

2      regulation to make such an order, the surgical dressings are covered

3      separately under Part B.

4  Medicare Benefit Policy Manual, Pub. 100-02, Chapter 15, § 100.

5  **<u>DOCUMENTATION OF MEDICAL NECESSITY – GENERALLY</u>**

6      33.    The Medicare Program Integrity Manual, Pub. 100-08, Chapter 5,

7  § 5.7, entitled "Documentation in the Patient's Medical Record", states the

8  following:

9          For any DMEPOS item to be covered by Medicare, the

10      patient's medical record must contain sufficient documentation of the

11      patient's medical condition to substantiate the necessity for the type

12      and quantity of items ordered and for the frequency of use or

13      replacement (if applicable). The information should include the

14      patient's diagnosis and other pertinent information including, but not

15      limited to, duration of the patient's condition, clinical course

16      (worsening or improvement), prognosis, nature and extent of

17      functional limitations, other therapeutic interventions and results, past

18      experience with related items, etc. If an item requires a CMN

19      (Certificate of Medical Necessity) or DIF (DME Information Form), it

20      is recommended that a copy of the completed CMN or DIF be kept in

21      the patient's record. However, neither a physician's order nor a CMN

22      nor a DIF nor a supplier prepared statement nor a physician attestation

23      by itself provides sufficient documentation of medical necessity, even

24      though it is signed by the treating physician or supplier. There must be

25      information in the patient's medical record that supports the medical

26      necessity for the item and substantiates the answers on the CMN (if

27      applicable) or DIF (if applicable) or information on a supplier

28      prepared statement or physician attestation (if applicable). . . . .

1      The patient's medical record is not limited to the physician's

2      office records. It may include hospital, nursing home, or HHA records

3      and records from other health care professionals.

4      The documentation in the patient's medical record does not

5      have to be routinely sent to the supplier or to the DME MACs, DME

6      PSCs, or ZPICs. However, the DME MACs, DME PSCs, or ZPICs

7      may request this information in selected cases. If the DME, DME

8      PSCs, or ZPICs do not receive the information when requested or if

9      the information in the patient's medical record does not adequately

10      support the medical necessity for the item, then on assigned claims the

11      supplier is liable for the dollar amount involved unless a properly

12      executed advance beneficiary notice (ABN) of possible denial has

13      been obtained.

14  *Id.* (emphasis added).

15                  **FACTUAL BACKGROUND**

16      34.    Plaintiff is a Medicare supplier of wound care supplies, including, but

17  not limited to, foam dressings (A6309, A6210, A6212); gauze (A6222); collagen

18  dressings (A6021); specialty absorptive dressings (A6210); conforming dressings

19  (A6446, A6253); alginate dressings (A6197); tape (A4452); hydrogel dressings

20  (A6242, A6248); transparent film (A6257); and composite dressings (A6200,

21  A6201, A6203). The composite dressings provided by Plaintiff include non-

22  bordered composite dressings, which generally are wound care dressings that do not

23  contain a built-in adhesive border.   Plaintiff primarily furnishes wound care

24  supplies to residents of long term care facilities.   Plaintiff files claims with several

25  CMS authorized contractors for the processing and reimbursement of claims for

26  supplies that are furnished to beneficiaries under Part B of the Medicare program.

27      35.   After all of its claims were initially denied in each of the underlying

28  dockets, Plaintiff requested a redetermination of the claims at issue.   Plaintiff's

1  claims were again denied.  Plaintiff then timely filed requests for reconsideration

2  with the relevant Qualified Independent Contractors ("QIC"), which also denied all

3  of Plaintiff's claims.  In docket M-11-146, the denial was purportedly due to a lack

4  of documentation to support medical necessity for the wound care supplies at issue,

5  as well as a misapplication of the LCDs relevant to foam dressings.  In Docket M-

6  11-12, the denials were based on these same reasons with the addition of denials for

7  non-bordered composite dressings on the basis that the HCPCS codes A6200,

8  A6201, and A6202 had been removed from the Medicare fee schedule and were not

9  eligible for coverage.  Plaintiff timely filed requests for ALJ hearings.

10      36.    At the ALJ hearing level, Plaintiff agreed to allow the ALJs to

11  adjudicate a 50-claim sample in order to facilitate the processing of the appeals and

12  extrapolation of the findings to the full universe of claims at issue.

13      37.    In Docket M-11-12, the ALJ disagreed with the QIC and determined

14  that for certain claims, there was sufficient documentation in the record to support

15  medical necessity of the wound care supplies at issue.  The ALJ erred in agreeing

16  with the QIC that reimbursement was not available for non-bordered composite

17  dressings based on the erroneous grant of substantial deference to the DME PSC

18  Policy Articles that had been issued.[2]  The ALJ rendered a partially favorable

19  decision for Plaintiff in that docket.[3]  Plaintiff timely appealed the unfavorable

20  portions of the ALJ decisions to the MAC.

21      38.    In Docket M-11-146, the ALJ erroneously upheld the QIC's

22  determination that Plaintiff's documentation was not sufficient to support medical

23

24  [2] As the MAC properly found, "policy articles do not carry the same authoritative
weight as an LCD" and are not necessarily entitled to the substantial deference

25  afforded to LCDs pursuant to 42 C.F.R. § 405.1062(a).  Policy articles are only
informational documents created by Medicare contractors that are not entitled to

26  any deference under the regulations or law.

27  [3] Based upon the statistical sample, the ALJ concluded that Plaintiff was entitled to
payment of 11.6% of the total amount at issue in the universe.   MAC Final

28  Decision at 4.

necessity of the wound care supplies at issue under the improper "longitudinal information" standard.  That standard, instead of requiring medical suppliers, such as Plaintiff, to demonstrate the medical necessity of supplies at the time they are ordered and delivered, as would be proper, erroneously imparts a requirement to demonstrate the necessity before and after the actual date of order or delivery.

39.   The MAC upheld the decision of the ALJ in Docket M-11-146, and in Docket M-11-12 found that the ALJ erred in relying on the documentation submitted by Plaintiff in order to support the medical necessity of the wound care supplies furnished to beneficiaries.  Accordingly, the MAC denied all of Plaintiff's claims for reimbursement in each docket.

## IMPROPER MODIFICATION OF HCPCS CODES

40.   The non-bordered composite dressings furnished by Plaintiff are manufactured by MPM Medical, Inc. ("MPM") and Medline Industries, Inc. ("Medline").

41.   MPM and Medline independently requested and received separate coding decisions from the SADMERC regarding the appropriate HCPCS codes to use for non-bordered composite dressings for purposes of Medicare billing, as required by CMS mandate.

42.   The SADMERC determined that the non-bordered composite dressings manufactured by MPM and Medline met the description for non-bordered composite dressings as defined in the DMERC Medical Policy for Surgical Dressings, in December 2004 and April 2006, respectively.  Accordingly, the SADMERC assigned the non-bordered composite dressings to the following HCPCS Codes: (a) A6200 for Composite dressing, pad 16 sq. in. or less, without adhesive border; (b) A6201 for a Composite dressing, pad size more than 16 sq. in. or less than 48 sq. in., without adhesive border; and (c) A6202 for a Composite dressing, pad size more than 48 sq. in., without adhesive border.

43.     Pursuant to the SADMERC's decisions, Plaintiff has submitted claims for non-bordered composite dressings for reimbursement under Medicare Part B with HCPCS codes A6200, A6201, and A6202.

44.     Shortly after it began to submit claims under these HCPCS codes, the DME-MACs began denying large numbers of claims submitted by Plaintiff due to a purported lack of medical necessity.  For example, between September 1, 2004 and August 1, 2005, thousands of Plaintiff's claims were denied based upon an alleged lack of medical necessity.  Plaintiff appealed these determinations and the vast majority of these cases were overturned on appeal by Administrative Law Judges ("ALJs").

45.     During the relevant time period, the DME PSC Medical Directors provided testimony at these ALJ hearings through various means, including in-person and telephonic appearances and by letter.  Their testimony regarding the medical necessity of Plaintiff's products was consistently rejected by the ALJs.

46.     Upon information and belief, the DME PSC Medical Directors, faced with the prospect of continuing reversals in the administrative appeal process, decided collectively to devise a strategy that would allow them to deny Plaintiff's claims while shielding their decisions from any administrative review.  This decision had several components including: (1) changing the definition of composite dressings; (2) invalidating HCPCS codes A6200, A6201, and A6202; and (3) denying reimbursement for these claims under a technical classification and thereby refusing to grant an administrative remedy to suppliers whose claims for such codes have been denied.

47.     First, the DME PSCs, without authority, purported to change the definition of "composite dressings."  As discussed above, the DME PSCs were responsible, in part, for creating Medicare coverage guidelines and policies, but were not responsible for defining the products that qualify for HCPCS codes.

48.     In September 2006, two contractors and agents of CMS, TriCenturion, the Region A/B DME PSC, and Palmetto GBA, a former DMERC, issued bulletins pursuant to which they purported to revise the definition of composite dressings. The change was stated to be effective for claims with dates of service on or after October 1, 2006.  In March 2007, the other DME PSCs followed suit and notified the supplier community through a Policy Article about the alleged revisions to the definition of composite dressings, with a retroactive effective date of January 2007. As discussed above, CMS contractors use a Policy Article as a mechanism to inform the supplier community about certain changes to coverage guidelines for Medicare covered items within their respective jurisdictions.   The revised definitions contained in the Policy Article required, for the very first time, that a composite dressing have a physical adhesive border.

49.     Prior to January 2007, the term "composite dressings" was defined as follows by the DMERC Medical Policy for Surgical Dressings:

> Composite   dressings   (A6200-A6205)   are   products   combining physically distinct components into a single dressing that provides multiple functions.  These functions must include, but are not limited to:  (a) a bacterial barrier, (b) an absorptive layer other than an alginate  or  other  fiber  gelling  dressings,  foam,  hydrocolloid,  or hydrogel, and (c) either a semi-adherent or non-adherent property over the wound site.

50.     Effective January 2007, the DME PSC's Policy Article contained the following definition for composite dressings:

> Composite  dressings  (A6200-A6205)  are  products  combining physically distinct components into a single dressing that provides multiple functions.  These functions must include, but are not limited to: (a) a physical (not chemical) bacterial barrier that is present over the entire dressing pad and extends out into the adhesive border, (b)

an absorptive layer other than an alginate or other fiber gelling dressing, foam, hydrocolloid, or hydrogel, and (c) either a semi-adherent or nonadherent property over the wound site.

Codes for composite dressings without adhesive border (A6200, A6201, and A6202) are invalid for claim submission.

51.    The second major way in which the DME PSCs have attempted to shield their decisions from administrative review was by unilaterally invalidating HCPCS codes A6200, A6201, and A6202.

52.    Although the SADMERC had previously indicated that non-bordered composite dressings sold by Plaintiff were appropriately classified by HCPCS codes A6200, A6201, or A6202, the Policy Articles at issue indicate that codes for composite dressings without adhesive border A6200, A6201, and A6202 would be invalid for claim submission.

53.    In response to the announced invalidation of these codes, Plaintiff contacted the Coverage and Analysis Group ("CAG") within the Office of Clinical Standards and Quality of CMS.  In turn, CAG requested that the Medical Directors of the DME PSCs at the time provide an explanation as to why the HCPCS codes were invalidated.   The Medical Directors, who at the time included Drs. Paul Hughes, Mark Pilley and Adrian Oleck, responded to CAG that they had not invalidated the HCPCS codes or eliminated coverage of non-bordered composite dressings, but merely had decided that non-bordered dressings no longer met the definition of "composite dressings."  In fact, the Medical Directors had changed the applicable definition and unilaterally invalidated HCPCS codes A6200, A6201, and A6202.  They did so knowing that there were, and continue to be, no other products on the market that fit the revised definition of these codes.

54.    During this time, Plaintiff made several telephone inquiries to the CMS HCPCS Unit, including the HCPCS Coordinator, who confirmed that HCPCS codes A6200, A6201, and A6202 were in fact still valid for claim submission.

55.    The MAC, in Docket M-11-12, decided to ignore this evidence and rely solely on the publication of the CMS July 2007 HCPCS Quarterly Update. The HCPCS Quarterly Updates are not official determinations of the CMS HCPCS Workgroup, but instead essentially summarize the actions taken by CMS contractors pursuant to NCDs, LCDs, or Policy Articles.   The June 2007 HCPCS Quarterly Update purported to remove HCPCS codes A6200, A6201, and A6202 from the Medicare fee schedule, but in fact the codes were not removed by the CMS HCPCS Workgroup, the only governing body with the authority to do so. Further, the applicable LCDs that were in place until 2010 provided that the codes A6200-A6202 were still valid codes to describe non-bordered composite dressings. Given that the claims at issue in this case concern supplies furnished between December 2007 and January 2009, the MAC relied upon its erroneous interpretation and acceptance of the July 2007 HCPCS Quarterly Update to reject all of the Plaintiffs claims under A6200, A6201, A6202.   Since the codes were actually valid until January 2010, all of the claims at issue were proper and should not have been rejected by the MAC on these grounds.

56.    During the relevant time, there was an established procedure within CMS for revising HCPCS codes.   According to CMS's Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures in place at the time, requests for coding revisions should have been made to CMS.   *See* Exhibit A. Anyone, including the DME-MACs, could have submitted a request for modifying the HCPCS Level II national code set.   The procedures indicated that a request for coding revisions should be sent to the Center for Medicare Management within CMS recommending the modification of a code.   There were three types of coding revisions to the HCPCS codes that could be requested, including, but not limited to, revising the language used to describe an existing code.

57.    According to these procedures, when a recommendation for revisions to the HCPCS was received, it was to be reviewed at a regularly scheduled meeting

DOCUMENT PREPARED
ON RECYCLED PAPER

1    of the CMS HCPCS Workgroup.   The HCPCS Level II Coding Procedures
2    indicated that the CMS Workgroup was an internal workgroup comprised of
3    representatives of the major components of CMS, the Medicaid State agencies and
4    the SADMERC.    Importantly, according to CMS' HCPCS Level II Coding
5    Procedures, the "CMS HCPCS Workgroup [was] responsible for making the final
6    decisions pertaining to additions, deletions, and revisions to the HCPCS codes," not
7    the DME PSCs.   The CMS HCPCS Workgroup was to review all requests for
8    coding changes and make final decisions regarding the annual update to the
9    national codes.  The SADMERC was to participate in this process by representing
10   Medicare program operating needs with input from the four Medicare contractors
11   that had responsibility for processing DMEPOS claims for the Medicare program.

12        58.    The HCPCS Level II Coding Procedures also stated that the CMS
13   Workgroup would apply certain criteria to determine whether there was a
14   demonstrated need for a new or modified code or the need to remove a code.
15   According to those procedures, when an existing code adequately described the
16   item in a coding request, then no new or modified code would be established.
17   Notably, any existing code also described products with (a) functions similar to the
18   item in the coding request and (b) no significant therapeutic distinctions from the
19   item in the coding request.  The procedures further provided that when an existing
20   code described products that were almost the same in function with only minor
21   distinctions from the item in the coding request, the item in the coding request
22   might be grouped with that code and the code descriptor modified to reflect the
23   distinctions.

24        59.    Upon information and belief, the DME PSCs did not submit to the
25   CMS Workgroup a formal request to change the definition of HCPCS codes
26   A6200, A6201, and A6202 prior to the DME PSCs' unilateral change in definition
27   of such codes.  In addition, the DME PSCs apparently did not adhere to the criteria
28   outlined in the HCPCS Level II Coding Procedures.

60.   The DME PSCs have acted in willful disregard of CMS procedures when they changed the definition of "composite dressings" and invalidated the applicable HCPCS codes.

61.   Based upon the revised definition, if a composite dressing does not have an adhesive border, then it does not qualify as a "composite dressing" and will therefore, not be reimbursed under HCPCS codes A6200, A6201, or A6202.

62.   There is no medical justification for the change in definition.  The DME PSCs seem to suggest that a composite dressing must have an adhesive border in order to maintain a bacterial barrier.  However, this reasoning is completely flawed in that the lack of a built-in adhesive border does not compromise the bacterial shield of a composite dressing.  Plaintiff obtained several medical opinions from nationally respected wound care experts pointing out the flaw in this reasoning and provided such opinions to the CAG and the DME PSC Medical Directors for review.

63.   In contradiction to the position apparently adopted by the DME PSC Medical Directors, all of these clinical experts agreed that the bacterial shield of a composite dressing is not compromised by the lack of an adhesive border.  In fact, all of these medical experts generally concluded that the adhesive borders are provided primarily as a means of convenience to minimize the need for other forms of securement during application of the dressing.  According to the clinical experts, non-bordered composite dressings generally contain an absorbent layer placed on a moisture barrier film backing.  This layer is of equal or greater importance in maintaining the bacterial barrier as are the absorptive properties of the dressing in controlling exudates and reducing the climate for bacterial proliferation.

64.   CAG ignored the expert medical opinions provided by Plaintiff.

65.   The DME PSCs' unilateral decision to change the definition of composite dressings in spite of the expert medical opinions provided by Plaintiff and to invalidate the codes at issue bypassed both the SADMERC and the CMS

1   HCPCS Workgroup in contravention of the rules and guidelines in place and thus
2   failed to ensure balanced, rationally-based decision making.

3       66.    The DME PSCs were required to follow established CMS guidelines
4   in order to revise and invalidate HCPCS codes A6200, A6201, and A6202.

5       67..   After the Policy Article, which is not subject to administrative review,
6   was issued and purportedly changed the definition of composite dressings, Plaintiff
7   continued to submit claims for reimbursement under HCPCS codes A6200, A6201,
8   and A6202.

9       68.    While initially the various contractors interpreted and applied the
10  respective Policy Articles differently, now, all Jurisdictions deny Plaintiff's claims
11  for non-bordered composite dressings.

12      69.    As indicated above, the contractors have denied Plaintiff's claims for
13  non-bordered composite dressings containing HCPCS codes A6200, A6201, and
14  A6202, on the assertion that the non-bordered composite dressings do not qualify
15  for coverage under the respective codes and/or that the codes have been deleted
16  from the fee schedule.

17      70.    The claims for non-bordered composite dressings that are the subject
18  of the Secretary's final decision and that are the subject of this case were filed using
19  the original codes for non-bordered composite dressings. Those claims were denied
20  by the relevant contractors in reliance on their Policy Articles.

21      71.    Plaintiff timely filed a request for reconsideration with the QIC. The
22  QIC also denied Medicare coverage of the claims for non-bordered composite
23  dressings. Plaintiff then filed a timely request for an ALJ hearing. The ALJ issued
24  a decision on August 5, 2010, and concluded that the non-bordered composite
25  dressings at issue were not covered by Medicare, and gave "substantial deference"
26  to the "Policy Articles." The ALJ has apparently mistakenly applied the review
27  procedures for LCDs to Policy Articles, as Policy Articles are not subject to
28  "substantial deference" in the same manner as an LCD.

72.     The Plaintiff timely appealed the ALJ's decision to the MAC.  In its request for review, the Plaintiff argued the following: (a) that the Policy Articles were not to be given "substantial deference" in the same manner as an LCD; and (b) if the Policy Articles were to be given the same power as an LCD there must be the provision of due process rights to review the Policy Articles in the same manner that an NCD or LCD may be challenged; rights that were not afforded to Plaintiff in this case.

73.     The MAC also stated that "[n]either an ALJ nor the Council has the authority to review HCPCS definitions, invalidation of codes, or any CMS action or inactions with respect to coding issues." MAC Final Decision at 14.  The MAC found that Plaintiff's claims for non-bordered composite dressings billed under HCPCS codes A6200, A6201, and A6202, are not Medicare covered items on the basis of the July 2007 HCPCS Update—a document which had no authority and referenced coding changes enacted contrary the applicable rules.  The decision of the MAC, which relied upon the improper revision and invalidation of codes A6200, A6201, and A6202, is infirm, because an agency's decisions that are contrary to its own rules are held to be arbitrary and capricious.

## IMPROPER REQUIREMENT OF LONGITUDINAL MEDICAL DOCUMENTATION

74.     In support of all of its claims, including but not limited to those under HCPCS codes A6200, A6201, and A6202, Plaintiff provided the following documentation to establish medical necessity: (a) Nursing Facility Patient Wound Care Orders; (b) Wound Care Skin Integrity Evaluation Reports; (c) Facility Admission Face Sheets; (d) Proof of Delivery; and (e) Invoices and packing lists reflecting the dressings shipped to the facility.

75.     The MAC based its claim denials in part on the mistaken assertion that Plaintiff "has not submitted any contemporaneous clinical documentation from the

1   beneficiaries' medical records to support the claims." MAC Opinion in Docket M-

2   11-12 at 12; *see also* MAC Opinion in Docket M-11-146 at 10.

3       76.    The MAC also erred in concluding that the "record does not contain

4   any primary, corroborating, daily or weekly documentation showing the clinical

5   course (worsening or improvement) of the wounds, the day-to-day care of the

6   wounds, or the totality of the beneficiaries' conditions to substantiate the need for

7   the types and quantities of dressing ordered.  The forms that the appellant did

8   submit provide the Council with, at most, monthly snapshots of a beneficiary's

9   condition without any daily or weekly longitudinal information as to the clinical

10  course of the wounds.  This limited documentation is insufficient to satisfy the

11  coverage criteria set forth in the LCD and to establish medical necessity."  MAC

12  Opinion in Docket M-11-12 at 12; MAC Opinion in Docket M-11-146 at 10.  This

13  conclusion was erroneous for at least the following three reasons.

14      77.    First, the documentation provided by Plaintiff, including the Nursing

15  Facility Patient Wound Care Orders, Wound Care Skin Integrity Evaluation

16  Reports and Facility Admission Face Sheets, are part of the beneficiaries' medical

17  records.  The documentation furnished by Plaintiff to support medical necessity is

18  certified by the facility staff and/or beneficiary caregivers, reflects information

19  gathered from the beneficiaries' medical record as well as demonstrates which

20  dressings are needed to properly treat the beneficiaries' wounds.  These forms

21  provide the very information required by the Medicare Act and the LCDs.

22      78.    Second, the MAC adopted an invalid standard for the type of

23  documentation required to support medical necessity.  Requiring a "longitudinal"

24  clinical picture of the patient is simply not the standard to support medical necessity

25  when submitting claims for reimbursement.  Rather, the standard is whether the

26  beneficiary has a current need for the supplies being issued, regardless of what need

27  may or may not have existed at some time in the past.  The supplies provided are

28

predicated on the current status and need of the wound for the dates of service at issue.

79.    Third, the MAC's demand for "longitudinal" information has no support in the applicable LCDs for Surgical Dressings, which state the following in regards to the type of documentation that may be used to support medical necessity:

Section 1833(e) of the Social Security Act precludes payment to any provider of services unless "there has been furnished such information as may be necessary in order to determine the amounts due such provider." It is expected that the patient's medical records will reflect the need for the care provided. The patient's medical records include the physician's office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals and test reports. This documentation must be available upon request.

An order for each item billed must be signed and dated by the treating physician, kept on file by the supplier, and made available upon request. Items billed before a signed and dated order has been received by the supplier must be submitted with an EY modifier added to each affected HCPCS code.

The order must specify (a) the type of dressing (e.g., hydrocolloid wound cover, hydrogel wound filler, etc.), (b) the size of the dressing (if appropriate), (c) the number/amount to be used at one time (if more than one), (d) the frequency of dressing change, and (e) the expected duration of need.

A new order is needed if a new dressing is added or if the quantity of an existing dressing to be used is increased. A new order is not routinely needed if the quantity of dressings used is decreased. However a new order is required at least every 3 months for each

1    dressing being used even if the quantity used has remained the same

2    or decreased.

3          Information defining the number of surgical/debrided wounds

4    being treated with a dressing, the reason for dressing use (e.g.,

5    surgical wound, debrided wound, etc.), and whether the dressing is

6    being used as a primary or secondary dressing or for some noncovered

7    use (e.g., wound cleansing) must be obtained from the physician,

8    nursing home, or home care nurse. The source of that information and

9    date obtained must be documented in the supplier's records.

10         Current clinical information which supports the reasonableness

11   and necessity of the type and quantity of surgical dressings provided

12   must be present in the patient's medical records. Evaluation of a

13   patient's wound(s) must be performed at least on a monthly basis

14   unless there is documentation in the medical record which justifies

15   why an evaluation could not be done within this timeframe and what

16   other monitoring methods were used to evaluate the patient's need for

17   dressings. Evaluation is expected on a more frequent basis (e.g.,

18   weekly) in patients in a nursing facility or in patients with heavily

19   draining or infected wounds. The evaluation may be performed by a

20   nurse, physician or other health care professional. This evaluation

21   must include the type of each wound (e.g., surgical wound, pressure

22   ulcer, burn, etc), its location, its size (length x width in cm.) and

23   depth, the amount of drainage, and any other relevant information.

24   This information must be available upon request.

25   LCD for Surgical Dressings (11460 and 11471), at 17 (emphasis added).

26         80.    The documentation submitted by Plaintiff to support medical necessity

27   complies with the documentation requirements of the LCDs and as reflected in the

28   relevant DME MAC Supplier Manuals.   Plaintiff's documentation includes a

facility-certified wound evaluation form that describes the wound type, size, location, dimensions, depth, and current drainage (amount of exudate) from the wound. The completed order form also complies with the criteria for a written physician order, since it is signed by the treating physician and describes the type, amount and frequency of changes of the dressings ordered.

81. The LCDs also indicate that additional documentation from hospitals, nursing facilities, and physicians should be available upon request. *Id*. On the dates of service at issue, the beneficiaries were residents of long-term care facilities, not hospitals, nor were they seen in the physicians' office; therefore, no "hospital records" or "physicians' office records" were generated and thus cannot be supplied.

82. Despite this, the MAC has apparently adopted a blanket policy of rejecting Plaintiff's forms as insufficient documentation of medical necessity, regardless of the information contained in each of the forms. And as a result of this policy, the MAC unreasonably denied all of Plaintiff's claims for reimbursement.

83. Moreover, Plaintiff has consistently provided the same types of documentation described above (*i.e.*, Nursing Facility Patient Wound Care Order Sheets and Wound Care Skin Integrity Evaluations, etc.) in order to support the medical necessity of wound care supplies furnished to Medicare beneficiaries and such documentation has usually been sufficient to establish medical necessity, provided that all other coverage criteria are met.

84. Plaintiff's documentation, in the same form as submitted in the instant cases, has been validated and approved throughout the course of extensive and repeated Medicare administrative appeals. Over the course of more than 13 years, with respect to more than 70,000 claims, numerous Administrative Law Judges (and earlier, Carrier Hearing Officers) have consistently found that Plaintiff's documentation meet the standards of sections 1862(a)(1) and 1833(e) of the Act,

1  applicable federal regulations, NCDs, LCDs (and their precursors, LMRPs), and/or
2  other standards.

3    85.   Plaintiff has relied on a series of dozens of administrative decisions
4  stating that its documentation is adequate.  Following this consistent validation,
5  Plaintiff has, relying heavily on the form of the approved documentation, adopted
6  nationwide business processes and trained hundreds of personnel in regards to
7  documentation requirements.

8    86.   According to the MAC, the Plaintiff "relied on the opinions of the
9  beneficiaries' physicians as expressed on the limited, appellant-generated forms it
10 submitted." MAC Final Opinion at 12.  It is absurd to think that Plaintiff's reliance
11 on the treating physician's opinion is misplaced.  The MAC has mischaracterized
12 Plaintiff's reliance on the beneficiaries' treating physicians in a misguided attempt
13 to ignore Plaintiff's documentation of medical necessity.  As discussed above,
14 Plaintiff also documented the relevant coverage criteria in compliance with the
15 LCDs for all of the claims at issue.  In addition, federal regulations dictate such
16 reliance.  Federal regulations state in relevant part:

17    (a)   Purpose.  The physician has a major role in determining
18       utilization of health services furnished by providers. The physician
19       decides upon admissions, orders tests, drugs, and treatments, and
20       determines the length of stay. Accordingly, sections 1814(a)(2) and
21       1835(a)(2) of the Act establish as a condition for Medicare payment
22       that a physician certify the necessity of the services and, in some
23       instances, recertify the continued need for those services.

24    Section 1814(a)(2) of the Act also permits nurse practitioners or
25       clinical nurse specialists to certify and recertify the need for post-
26       hospital extended care services.

27 42 C.F.R. § 424.10.

28

## LCD ON FOAM DRESSINGS DOES NOT COMPORT WITH ACCEPTED
## STANDARD OF CARE

87.    Federal regulation provides that: "ALJs and the MAC are not bound by LCDs, LMRPs, or CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a) (emphasis added).  An ALJ and the MAC obviously should not defer to an LCD when it will create a coverage result that is inconsistent with the accepted standard of care.  This is true of the applicable LCDs for the coverage of foam dressings, that only allow dressing changes 3 times weekly, while the standard of care is to inspect the wound and change the dressing daily.  In fact, the MAC acknowledges that the LCD contemplates scenarios in which a provider may submit claims for greater quantities of dressings and for more frequent dressing changes than Medicare would cover." MAC Opinion in Docket M-11-12 at 17; MAC Opinion in Docket M-11-146 at 12.

88.    The standard of care in the medical community is to conduct daily wound assessments of residents in long-term care facilities.  In order to properly assess a wound, one must remove all dressings covering the wound and cleanse the wound of any nonviable tissue.  Removed dressings are typically soiled with blood, exudate or other bodily fluids, and to reapply these soiled dressings to the wound would grossly deviate from the standard of care and would pose a serious health threat to the beneficiary.  Accordingly, the standard of care requires that in conjunction with daily wound assessments, new dressings must be applied after soiled dressings are removed.

89.    This standard of care – daily wound assessments and daily dressing changes where indicated – is driven largely by F314, a federal requirement concerning pressure sores in nursing homes.  See 42 C.F.R. § 483.25(c); see also MOHA F314, Medicare State Operations Manual, Pub. 100-07, App. PP, Guidance to Surveyors for Long-Term Care Facilities, at 1.  If a surveyor determines that a

nursing facility has violated F314, the surveyor issues a deficiency notice known as an "F-Tag." F314, which is codified in 42 C.F.R. § 483.25(c) states the following:

>   Pressure sores. Based on the comprehensive assessment of a resident, the facility must ensure that --
>
>   (a)    A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and
>
>   (b)    A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

90.    CMS has issued guidance concerning F314 which provides that facility staff, in regards to monitoring of a resident's skin condition should "[a]t least daily, . . . remain alert to potential changes in the skin condition and should evaluate and document identified changes." *Id.* at 10. In addition, "[a] facility should be able to show that its treatment protocols are *based upon current standards of practice.*" *Id.* at 15. (emphasis added).

91.    Under the language of F314 and the guidance provided by CMS, a facility would be ill-advised to assess a resident's wounds less frequently than daily. Less-than daily assessments would risk not only an F-Tag but, in the event of death of a resident with a pressure sore, a wrongful death lawsuit by the resident's family. Most facilities understandably choose to assess wounds daily. As a result, notwithstanding the LCDs, daily assessments and dressing changes have become the standard of care.

92.    Further evidence that the LCDs are inconsistent with the standard of care is found in recommended changes to LCD L11460, prepared by the National Pressure Ulcer Advisory Panel ("NPUAP") at the request of Noridian Administrative Services, LLC, the Jurisdiction D DME MAC. *Suggestions for*

*LCD Region 4 Revisions,* November 25, 2008.[4] The *Suggestions for LCD Region 4 Revisions* propose, among other things, changing the thrice-weekly limit on advanced dressings such as foam, stating in relevant part as follows:

> [I]t is paramount to remove soiled or wet dressings from the wound, because a wet or moist dressing permits bacterial entrance to the wound surface. Therefore, the amount of wound fluid should not be the only qualifier justifying more frequent dressing changes. The frequency of dressing changes should be based upon the clinical decision making of the clinician and/or wound specialist and not on a pre-set time period, nor exclusively predicated on level of exudate or wound fluid. A wound may be dry or desiccated, but based on the clinical presentation of the wound and patient, it may require daily visualization to promote wound healing.

*Suggestions for LCD Region 4 Revisions* at 1.

93. Plaintiff has been denied reimbursement totaling approximately $841,000 for the period December 2007 through January 2009 in Docket M-11-12. The number of claims denied as part of that docket is 812. Plaintiff has been denied reimbursement totaling approximately $881,000 for the period April 2008 through December 2009 in Docket M-11-146. The number of claims denied as part of that docket is 1,147. In total, Plaintiff has been denied reimbursement totaling approximately $1,722,000

---

[4] http://www.npuap.org/pdf/Suggestions%20for%20LCD%20Region%204%20Revisions%200109.pdf. Web site address as of October 3, 2010.

## COUNT I

**(Invalidity of Agency Action Based on Failure to Act in Observance of Procedure Required By Law in Violation of the Medicare Act and the Administrative Procedure Act**

**42 U.S.C. § 405 (g); 5 U.S.C. §§ 706(2)(A), (D))**

94.    The allegations contained in paragraphs 1 - 93 above are realleged and incorporated by reference herein.

95.    Defendants were not authorized under HCPCS Level II Coding Procedures to unilaterally invalidate or revise the definition of HCPCS codes for submission of claims under the Medicare program.

96.    Defendant's invalidation of HCPCS codes is contrary to established CMS HCPCS Level II Coding Procedures, and is therefore unlawful pursuant to 5 U.S.C. §§ 706(2)(A), (D).

97.    The DME PSCs failure to observe and comply with the Defendant's established HCPCS Level II Coding Procedures in order to invalidate and revise the definition of HCPCS codes A6200, A6201, A6202 constitutes invalid agency action based on failure to act in observance of procedure required by law, is a violation of the Medicare statute and regulations as well as the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (D).

98.    Plaintiff is therefore requesting this Court to conclude that Defendants' revision and invalidation of HCPCS codes is not authorized under CMS's established guidelines and therefore the MAC's decision relying upon that revision and invalidation must be reversed as not in accordance with law.

## COUNT II

**(Invalidity of Agency Action In Violation of the Administrative Procedure Act Pursuant to 5 U.S.C. § 706)**

99.    The allegations contained in paragraphs 1 - 98 above are realleged and incorporated by reference herein.

100.   Defendant's purported change in the definition of "composite dressings" without following established HCPCS Level II Coding Procedures is arbitrary and capricious agency action.

101.   Defendant's subsequent invalidation of HCPCS codes A6200, A6201, and A6202 is contrary to established HCPCS Level II Coding Procedures and is therefore invalid agency action.

102.   Defendant's establishment of new substantive standards of payment and eligibility for the provision of non-bordered composite dressings to Medicare beneficiaries without following CMS's HCPCS Level II Coding Procedures is arbitrary and capricious, an abuse of discretion and is therefore unlawful.

103.   Defendant's denial of Plaintiff's claims for alleged technical reasons is arbitrary and capricious and an abuse of discretion.

104.   Defendant's denial of Plaintiff's claims based on reasons that violate rules enacted by Defendant is arbitrary and capricious.

105.   Defendant's failure to provide an administrative remedy is without observance of procedure, is not in accordance with law and is therefore unlawful.

106.   The Plaintiff has exhausted its administrative remedies to the extent possible.  The MAC has ruled that neither the ALJ nor the MAC have the authority to review the issues presented by Plaintiff.  Forcing the Plaintiff to avail itself of an administrative process that has no authority to review Plaintiff's issues is arbitrary and capricious and not in accordance with the law.

107.   Defendant has intentionally acted in ways to arbitrarily deny Plaintiff's claims for non-bordered composite dressings without justification.

108.   Plaintiff has no other adequate administrative or other remedies available to redress Defendant's repeated denial of Plaintiff's claims for non-bordered composite dressings.  5 U.S.C. § 704.

109.   Plaintiffs are entitled to an order requiring CMS and its contractors to follow established CMS HCPCS Level II Coding Procedures to revise and

1    invalidate a HCPCS code and payment on its denied claims as a result of this

2    unlawful revision and invalidation.

3                                    **COUNT III**

4    **(Invalidity of Agency Action In Violation of the Administrative Procedure Act**

5                              **Pursuant to 5 U.S.C. § 706)**

6          110.   The allegations contained in paragraphs 1 - 109 above are realleged

7    and incorporated by reference herein.

8          111.   Defendant's blanket rejection of Plaintiff's documentation to support

9    medical necessity constitutes invalid agency action.

10         112.   Defendant's denial of all of Plaintiff's claims purportedly due to a lack

11   of medical necessity is arbitrary and capricious and an abuse of discretion.

12         113.   Defendant's denial of Plaintiff's claims purportedly due to a lack of

13   documentation to support medical necessity is contrary to the substantial evidence

14   in the record.

15         114.   Plaintiff has no other adequate administrative or other remedies

16   available to redress Defendant's repeated denial of Plaintiff's claims for surgical

17   dressings. 5 U.S.C. § 704.

18         115.   Plaintiff is entitled to an order requiring CMS and its contractors to

19   follow established policy regarding documentation requirements and payment on its

20   denied claims as a result of this unlawful blanket rejection of Plaintiff's

21   documentation of medical necessity for the wound care supplies at issue.

22                                    **COUNT IV**

23         **(INVALIDITY OF AGENCY ACTION IN VIOLATION OF THE**

24   **ADMINISTRATIVE PROCEDURE ACT PURSUANT TO 5 U.S.C. § 706)**

25         116.   The allegations contained in paragraphs 1 - 115 above are realleged

26   and incorporated by reference herein.

27         117.   Defendant's determination that Plaintiff was not entitled to a limitation

28   of liability pursuant Section 1879 or 1870(b) of the Act due to a finding that

1  Plaintiff had "actual or constructive knowledge of noncoverage" and/or that
2  Plaintiff "was not without fault with respect to the overpayments" is contrary to the
3  substantial evidence in the record and is arbitrary and capricious.

4    118. Plaintiff is entitled to an order reversing Defendant's determination
5  and holding that it is not liable for overpayments as it was without fault with
6  respect to overpayments due to Defendant's failure to follow its own rules and
7  Plaintiff's reliance on previous rulings by Defendant that the charges were covered.

8  <center>**PRAYER FOR RELIEF**</center>

9    WHEREFORE, the Plaintiff respectfully requests as relief in this action that
10 the Court:

11   119. Enter an order reversing and setting aside Defendant's Final Decisions
12 and declaring that such Final Decisions are arbitrary and capricious, contrary to the
13 substantial evidence in the record, contrary to law, otherwise in violation of law and
14 the Defendant's own regulations.

15   120. Enter an order declaring that Defendant's revision and invalidation of
16 HCPCS codes A6200, A6201, and A6202 was not authorized under established
17 HCPCS Level II Coding Procedures and is null and void and of no effect.

18   121. Order the Defendant to process and reimburse Plaintiff for the claims
19 at issue at the appropriate fee schedule amounts that were in effect at the time
20 supplies were furnished to beneficiaries.

21   122. In the alternative of the preceding paragraph, issue an Order finding
22 that Plaintiff is entitled to keep the alleged overpayment pursuant to Sections 1870
23 and 1879 of the Act, because Plaintiff is without fault as to the overpayment and
24 was without knowledge, actual or constructive, of the noncoverage.

25   123. Award the Plaintiff its costs and reasonable attorneys' fees; and

26   124. Award Plaintiff such other relief as the Court may deem just and
27 proper.

28

1 | Dated:  October 11. 2011

ROBERT W. FISCHER, JR.
SPENCER PERSSON
**FULBRIGHT & JAWORSKI L.L.P.**

Of Counsel
FREDERICK ROBINSON
LESLEY REYNOLDS
**FULBRIGHT & JAWORSKI L.L.P.**

By _____
   Robert W. Fischer, Jr.

Attorneys for Plaintiff
GORDIAN MEDICAL, INC.

95242200.6

DOCUMENT PREPARED
ON RECYCLED PAPER

**EXHIBIT A.**

## HEALTHCARE COMMON PROCEDURE CODING SYSTEM (HCPCS) LEVEL II CODING PROCEDURES

This information provides a description of the procedures CMS follows in making coding decisions.

**FOR FURTHER INFORMATION CONTACT:**
Gloria Knight (410) 786-4598, Felicia Eggleston (410) 786-9287, Jennifer Carver (410) 786-6610, Trish Brooks (410) 786-4561, or Cindy Hake (410) 786-3404 for HCPCS level II coding issues.

### A. HCPCS BACKGROUND INFORMATION

Each year, in the United States, health care insurers process over 5 billion claims for payment. For Medicare and other health insurance programs to ensure that these claims are processed in an orderly and consistent manner, standardized coding systems are essential. The HCPCS Level II Code Set is one of the standard code sets used for this purpose. The HCPCS is divided into two principal subsystems, referred to as level I and level II of the HCPCS. Level I of the HCPCS is comprised of CPT (Current Procedural Terminology), a numeric coding system maintained by the American Medical Association (AMA). The CPT is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs. Decisions regarding the addition, deletion, or revision of CPT codes are made by the AMA. The CPT codes are republished and updated annually by the AMA. Level I of the HCPCS, the CPT codes, does not include codes needed to separately report medical items or services that are regularly billed by suppliers other than physicians.

Level II of the HCPCS is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) when used outside a physician's office. Because Medicare and other insurers cover a variety of services, supplies, and equipment that are not identified by CPT codes, the level II HCPCS codes were established for submitting claims for these items. The development and use of level II of the HCPCS began in the 1980's. Level II codes are also referred to as alpha-numeric codes because they consist of a single alphabetical letter followed by 4 numeric digits, while CPT codes are identified using 5 numeric digits.

In October of 2003, the Secretary of HHS delegated authority under the HIPAA legislation to CMS to maintain and distribute HCPCS Level II Codes. As stated in 42 CFR Sec. 414.40 (a) CMS establishes uniform national definitions of services, codes to represent services, and payment modifiers to the codes. Within CMS there is a CMS HCPCS Workgroup which is an internal workgroup comprised of representatives of the major components of CMS, as well as other consultants from pertinent Federal agencies. Prior to December 31, 2003, Level III HCPCS were developed and used by Medicaid State agencies, Medicare contractors, and private insurers in their specific programs or local areas of jurisdiction. For purposes of Medicare, level III codes were also referred to as local codes. Local codes were established when an insurer preferred that suppliers use a local code to identify a service, for which there is no level I or level

1

II code, rather than use a "miscellaneous or not otherwise classified code." The Health Insurance Portability and Accountability Act of 1996 (HIPAA) required CMS to adopt standards for coding systems that are used for reporting health care transactions. We published, in the Federal Register on August 17, 2000 (65 FR 50312), regulations to implement this part of the HIPAA legislation. These regulations provided for the elimination of level III local codes by October 2002, at which time, the level I and level II code sets could be used. The elimination of local codes was postponed, as a result of section 532(a) of BIPA, which continued the use of local codes through December 31, 2003.

**B. HCPCS LEVEL II CODES**

The regulation that CMS published on August 17, 2000 (45 CFR 162.10002) to implement the HIPAA requirement for standardized coding systems established the HCPCS level II codes as the standardized coding system for describing and identifying health care equipment and supplies in health care transactions that are not identified by the HCPCS level I, CPT codes. The HCPCS level II coding system was selected as the standardized coding system because of its wide acceptance among both public and private insurers. Public and private insurers were required to be in compliance with the August 2000 regulation by October 1, 2002. The purpose of this section is to provide a general description of the current HCPCS level II coding system.

The HCPCS level II coding system is a comprehensive and standardized system that classifies similar products that are medical in nature into categories for the purpose of efficient claims processing. For each alphanumeric HCPCS code, there is descriptive terminology that identifies a category of like items. These codes are used primarily for billing purposes. For example, suppliers use HCPCS level II codes to identify items on claim forms that are being billed to a private or public health insurer.

HCPCS is a system for identifying items and services. It is not a methodology or system for making coverage or payment determinations, and the existence of a code does not, of itself, determine coverage or non-coverage for an item or service. While these codes are used for billing purposes, decisions regarding the addition, deletion, or revision of HCPCS codes are made independent of the process for making determinations regarding coverage and payment.

Currently, there are national HCPCS codes representing over 4,000 separate categories of like items or services that encompass millions of products from different manufacturers. When submitting claims, suppliers are required to use one of these codes to identify the items they are billing. The descriptor that is assigned to a code represents the definition of the items and services that can be billed using that code. To avoid any appearance of endorsement of a particular product through HCPCS, the descriptors that are used to identify codes do not refer to specific products. For this reason, brand or trade names are not used to describe the products represented by a code.

In summary, the HCPCS level II coding system has the following characteristics:

- This system ensures uniform reporting on claims forms of items or services that are medical in nature. Such a standardized coding system is needed by public and private insurance programs to ensure the uniform reporting of services on claims forms by suppliers and for meaningful data collection.

2

EXHIBIT A

- The descriptors of the codes identify a category of like items or services rather than specific products or brand/trade names.
- The coding system is not a methodology for making coverage or payment determinations. Each payer makes determinations on coverage and payment outside this coding process.

## C. TYPES OF HCPCS LEVEL II CODES

There are several types of HCPCS level II codes depending on the purpose for the codes and who is responsible for establishing and maintaining them.

### Permanent National Codes

National permanent HCPCS level II codes are maintained by the CMS HCPCS Workgroup. The Workgroup is responsible for making decisions about additions, revisions, and deletions to the permanent national alpha-numeric codes. These codes are for the use of all private and public health insurers. Since HCPCS is a national coding system all payers will be represented in the Workgroup including representatives from private insurance agencies, the Statistical Analysis Durable Medical Equipment Regional Carriers (SADMERC), and Medicaid will participate in the workgroup meetings and provide input as to what is necessary to meet each party's program operating needs.

The permanent national codes serve the important function of providing a standardized coding system that is managed jointly by private and public insurers. This standardized approach to developing a set of uniform codes provides a stable environment for claims submission and processing.

### Dental Codes

The dental codes are a separate category of national codes. The Current Dental Terminology (CDT) is a publication copyrighted by the American Dental Association (ADA) that lists codes for billing for dental procedures and supplies. The CDT is included in HCPCS level II. Decisions regarding the revision, deletion, or addition of CDT codes are made by the ADA and not the CMS HCPCS Workgroup.

As the Department of Health and Human Services has an agreement with the AMA pertaining to the use of the Current Procedural Terminology (CPT) codes for physician services, it also has an agreement with the ADA to include CDT as a set of HCPCS level II codes for use in billing for dental services.

### Miscellaneous Codes

National codes also include "miscellaneous/not otherwise classified" codes. These codes are used when a supplier is submitting a bill for an item or service and there is no existing national code that adequately describes the item or service being billed. The importance of miscellaneous codes is that they allow suppliers to begin billing immediately for a service or item as soon as it is allowed to be marketed by the Food and Drug Administration (FDA) even though there is no distinct code that describes the service or item. A miscellaneous code can be used during the period of time a request for a new code is being considered under the HCPCS review process. The use of miscellaneous codes also helps us to avoid the inefficiency and administrative burden

.3

of assigning distinct codes for items or services that are rarely furnished or for which we expect to receive few claims.

Because of miscellaneous codes, the absence of a specific code for a distinct category of products does not affect a supplier's ability to submit claims to private or public insurers and does not affect patient access to products. Claims with miscellaneous codes are manually reviewed, the item or service being billed must be clearly described, and pricing information must be provided along with documentation to explain why the item or service is needed by the beneficiary.

Ordinarily, before using a miscellaneous code on a claim form, a supplier should check with the entity that will receive the payment claim to determine whether there is a specific code that should be used rather than a miscellaneous code. In the case of claims that are to be submitted to one of the four durable medical equipment regional carriers (DMERCs), suppliers that have coding questions should check with the statistical analysis durable medical equipment carrier (SADMERC) under contract to CMS. The SADMERC is responsible for providing suppliers and manufacturers with assistance in determining which HCPCS code should be used to describe DMEPOS items for the purpose of billing Medicare. The SADMERC has a toll free helpline for this purpose, (877) 735-1326, which is operational during the hours of 9 AM to 4 PM (EST) In addition, The SADMERC publishes a product classification list on its website that lists individual items to code categories. More information about the SADMERC and the SADMERC's product classification list can be found at http://www.palmettogba.com.

If no code exists that describes the product category to which the item belongs, and if the item fits a Medicare Benefit Category, the SADMERC may instruct the supplier to submit claims using a "miscellaneous/not otherwise classified" code. If an item does not fit a Medicare Benefit Category, the SADMERC might assign a code that indicates that the product is not covered by Medicare for example, code A9270, NON-COVERED ITEM OR SERVICE. If an item is included or bundled into another code and not separately reimbursed by Medicare, the SADMERC may assign the code that includes the item or a code that indicates that the item is included as a component of another code. In those cases in which a supplier or manufacturer has been advised to use a miscellaneous code because there is no existing code that describes a given product, and the supplier or manufacturer believes that the code is needed, it should submit a request to modify the HCPCS in accordance with the established process. The process for requesting a revision to the HCPCS level II codes is explained below.

**Temporary National Codes**

Temporary codes are for the purpose of meeting, within a short time frame, the national program operational needs of a particular insurer that are not addressed by an already existing national code. The CMS HCPCS Workgroup has set aside certain sections of the HCPCS code set to allow the Workgroup to develop temporary codes. Decisions regarding the number and type of temporary codes and how they are used are also made by the CMS HCPCS Workgroup. These codes are used at the discretion of CMS. This means that if, before the next scheduled annual update for permanent codes, the CMS HCPCS Workgroup needs a code in order to meet specific operating needs that pertain to its particular programs, it may establish a national temporary code. In the case of Medicare, decisions regarding temporary codes are made by the CMS

4

HCPCS workgroup. For example, Medicare may need additional codes before the next scheduled annual HCPCS update to implement newly issued coverage policies or legislative requirements. Although we establish temporary codes to meet our specific operational needs, the temporary codes we establish can be used by other insurers. Temporary codes allow insurers the flexibility to establish codes that are needed before the next January 1 annual update for permanent national codes or until consensus can be achieved on a permanent national code. Permanent national codes are only updated once a year on January 1.

The CMS HCPCS Workgroup may decide to replace temporary codes with permanent codes. However, temporary codes do not have established expiration dates. Whenever a permanent code is established by the CMS HCPCS Workgroup to replace a temporary code, the temporary code is deleted and cross-referenced to the new permanent code.

**Types of temporary HCPCS codes:**

- The C codes were established to permit implementation of section 201 of the Balanced Budget Refinement Act of 1999. The C codes identify items that may qualify for "pass through" payments under the hospital outpatient prospective payment system (HOPPS). These codes are used exclusively for the HOPPS purposes and are only valid for Medicare on claims submitted by hospital outpatient departments. More information regarding HOPPS can be found at http://www.cms.hhs.gov/providers/hopps/.
- The G codes are used to identify professional health care procedures and services that would otherwise be coded in CPT-4 but for which there are no CPT-4 codes.
- The Q codes are used to identify services that would not be given a CPT-4 code, such as drugs, biologicals, and other types of medical equipment or services, and which are not identified by national level II codes but for which codes are needed for claims processing purposes.
- The K codes were established for use by the DMERCs when the currently existing permanent national codes do not include the codes needed to implement a DMERC medical review policy. For example, codes other than the permanent national codes may be needed by the DMERCs to identify certain product categories and supplies necessary for establishing appropriate regional medical review coverage policies.
- The S codes are used by private insurers to report drugs, services, and supplies for which there are no national codes but for which codes are needed by the private sector to implement policies, programs, or claims processing. They are for the purpose of meeting the particular needs of the private sector. These codes are also used by the Medicaid program, but they are not payable by Medicare.
- Certain H codes are used by those State Medicaid agencies that are mandated by State law to establish separate codes for identifying mental health services such as alcohol and drug treatment services.
- The T codes are designated for use by Medicaid State agencies to establish codes for items for which there are no permanent national codes and for which codes are necessary to meet a national Medicaid program operating need. T codes are not used by Medicare but can be used by private insurers.

**Code Modifiers**

5

In some instances, insurers instruct suppliers that a HCPCS code must be accompanied by code modifier to provide additional information regarding the service or item identified by the HCPCS code. Modifiers are used when the information provided by a HCPCS code descriptor needs to be supplemented to identify specific circumstances that may apply to an item or service. For example, a UE modifier is used when the item identified by a HCPCS code is "used equipment," a NU modifier is used for "new equipment." The level II HCPCS modifiers are either alpha-numeric or two letters.

## C. REQUESTING A REVISION TO THE HCPCS LEVEL II CODES

Anyone can submit a request for modifying the HCPCS level II national code set. A document explaining the HCPCS revision process, as well as a detailed format for submitting a request, is available on the HCPCS website at http://www.cms.hhs.gov/medicare/hcpcs. Besides the information requested in this format, a requestor should also submit any additional descriptive material, including the manufacturer's product literature and information, that it thinks would be helpful in furthering our understanding of the medical features of the item for which a coding revision is being recommended. The HCPCS coding review process is an ongoing continuous process. Requests may be submitted at any time throughout the year. Requests that are received and complete by January 3 of the current year will be considered for inclusion in the next annual update (January 1st of the following year). Requests received on or after January 3, and requests received earlier that require additional evaluation, will be included in a later HCPCS update. There are three types of coding revisions to the HCPCS that can be requested:

1. That a permanent code be added
   When there is not a distinct code that describes a product, a code may be requested (1) if the FDA allows the product to be marketed in the United States and (2) if the product is not a drug, the product has been on the market for at least 3 months; if the product is a drug, there is no requirement to submit marketing data; and (3) the product represents 3 percent or more of the outpatient use for that type of product in the national market. If a request for a new code is approved, the addition of a new HCPCS codes does not mean that the item is necessarily covered by any insurer. Whether an item identified by a new code is covered is determined by the Medicare law, regulations, and medical review policies and not by the assignment of a code.

2. That the language used to describe an existing code be changed
   When there is an existing code, a recommendation to modify the code can be made when an interested party believes that the descriptor for the code needs to be modified to provide a better description of the category of products represented by the code.

3. That an existing code be deleted

When an existing code becomes obsolete or is duplicative of another, a request can be made to delete the code.

When there is no currently existing code to describe a product, a miscellaneous code/not otherwise classified code may be appropriate. The use of a miscellaneous code permits a claims

6

history to be established for an item that can be used to support the need for a national permanent code.

Requests for coding revisions should be sent to the following:
Alpha-Numeric HCPCS Coordinator,
Center for Medicare Management,
Centers for Medicare and Medicaid Services,
C5-08-27,
7500 Security Boulevard,
Baltimore, MD 21244-1850.

**CMS HCPCS Workgroup**
The CMS HCPCS Workgroup is an internal workgroup comprised of representatives of the major components of CMS, the Medicaid State agencies, and the SADMERC. The SADMERC represents Medicare program operating needs with input from the four DMERCs which have responsibility for processing Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) claims for the Medicare program. Coding decisions are coordinated with both public and private insurers. The CMS HCPCS workgroup considers each coding request, and beginning with the 2006 cycle, will determine whether HCPCS coding requests warrant a change to the national permanent codes. Prior to the 2006 cycle, the National Panel was responsible for final decisions.

When a recommendation for a revision to the HCPCS is received, it is reviewed at a regularly scheduled meeting of the CMS HCPCS Workgroup. Ordinarily, the CMS HCPCS Workgroup meets monthly to discuss whether coding requests warrant a change to the national permanent codes.

**Evaluating HCPCS Coding Requests**
The CMS HCPCS workgroup applies the following criteria to determine whether there is a demonstrated need for a new or modified code or the need to remove a code:
1. When an existing code adequately describes the item in a coding request, then no new or modified code is established. An existing code adequately describes an item in a coding request when the existing code describes products with the following:
   - Functions similar to the item in the coding request.
   - No significant therapeutic distinctions from the item in the coding request.
2. When an existing code describes products that are almost the same in function with only minor distinctions from the item in the coding request, the item in the coding request may be grouped with that code and the code descriptor modified to reflect the distinctions.
3. A code is not established for an item that is used only in the inpatient setting or for an item that is not diagnostic or therapeutic in nature.
4. A new or modified code is not established for an item unless the FDA allows the item to be marketed. FDA approval documentation is required to be submitted with the coding request application for all non-drug items. For drugs, FDA approval documentation will be accepted up to March 31 following the application deadline as long as the application is otherwise complete and submitted by the deadline.

7

EXHIBIT A

41

5. There must be sufficient claims activity or volume, as evidenced by 3 months of marketing activity for non-drug products, so that the adding of a new or modified code enhances the efficiency of the system and justifies the administrative burden of adding or modifying a code.

6. The determination to remove a code is based on the consideration of whether a code is obsolete (for example, products no longer are used, other more specific codes have been added) or duplicative and no longer useful (for example, new codes are established that better describe items identified by existing codes). In developing its decisions, the HCPCS Workgroup uses the criteria mentioned above. In deciding upon a recommendation, the workgroup does not include cost as a factor.

**Opportunity for Public Input/Public Meeting Process for HCPCS**

On December 21, 2000, the Congress passed the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), Pub. L. 106-554. Section 531(b) of BIPA mandated that we establish procedures that permit public consultation for coding and payment determinations for new DME under Medicare Part B of title XVIII of the Social Security Act (the Act). As part of HCPCS reform, CMS expanded the public meeting forum to include all public requests as of the 2005-2006 coding cycle. Accordingly, CMS hosts annual public meetings that provide a forum for interested parties to make oral presentations and/or to submit written comments in response to preliminary coding and pricing recommendations for new durable medical equipment that have been submitted using the Healthcare Common Procedure Coding System coding revision process. Agenda items for the meetings will be published in advance of the public meeting on the HCPCS website at http://www.cms.hhs.gov/medicare/hcpcs. The agenda will include descriptions of the coding requests, the requestor, and the name of the product or service. This change will provide more opportunities for the public to become aware of coding changes under consideration, as well as opportunities for public input into decision-making.

The HCPCS coordinator schedules meetings with interested parties, at their request, as time permits, to discuss their recommendations regarding possible changes to the HCPCS level II codes. These meetings are held at the Central Office of CMS. In addition to representatives from the CMS HCPCS Workgroup, staff from Medicaid and Medicare coverage, payment and operations are invited to attend these meetings. These meetings are not related to the meetings mandated by section 531(b) of BIPA, they are also not decision making meetings or CMS HCPCS Workgroup meetings.

**Final Decisions**

The CMS HCPCS Workgroup is responsible for making the final decisions pertaining to additions, deletions, and revisions to the HCPCS codes. The CMS HCPCS Workgroup reviews all requests for coding changes and makes final decisions regarding the annual update to the national codes. The Workgroup sends letters to those who requested coding revisions to inform them of the Workgroup's decision regarding their coding requests. The decision letters include, but may not be limited to, the following types of responses:

EXHIBIT A

1. A change to the national codes has been approved that reflects, completely or in part, your coding request.
2. Your request for a coding revision to this year's update has not been approved because the scope of your request necessitates that additional consideration be given to your request before the CMS HCPCS Workgroup reaches a final decision.
3. Your reported sales volume was insufficient to support your request for a revision to the national codes. To determine whether there is sufficient sales volume to warrant a permanent code, we ask requestors to submit 3 months of the most recent sales volume for non-drug items. There is not a requirement to submit marketing data for drugs.
4. Your request for a new national code has not been approved because there already is an existing permanent or temporary code that describes your product.
5. Your request for a code has not been approved because your product is not used by health care providers for diagnostic or therapeutic purposes.
6. Your request for a code has not been approved because the code you requested is for capital equipment.
7. Your request for a code has not been approved because your product is an integral part of another service and payment for that service includes payment for your product; therefore, your product may not be billed separately to Medicare.
8. Your request for a revision to the language that describes the current code has not been approved because it does not improve the code descriptor.
9. Your request for a new code has not been approved because your product is not primarily medical in nature (for example, generally not useful in the absence of an illness or injury).
10. Your request for a code has not been approved because your product is used exclusively in the inpatient hospital setting.
11. Your request for a code has not been approved because it is inappropriate for inclusion in the HCPCS Level II code set and request should be submitted independently to another coding authority (e.g. AMA for CPT coding, ADA for CDT coding, etc.)

Decision letters also inform the requestors that they may contact the entity in whose jurisdiction a claim is filed for assistance in answering any coding questions. For Medicare, contact the SADMERC. Under contract to CMS, the SADMERC is responsible for providing suppliers and manufacturers with assistance in determining which HCPCS code should be used to describe DMEPOS items for the purpose of billing Medicare. The SADMERC has a toll free helpline for this purpose, (877) 735-1326, which is operational during the hours of 9 AM to 4 PM (EST). For Medicaid, contact the state Medicaid agency. For private insurance, contact the individual insurer. A requestor who is dissatisfied with the final decision may submit a new request asking the CMS HCPCS Workgroup to reconsider and re-evaluate the code request. At that time, the requestor should include new information or additional explanations to support the request.

Reconsideration Process
CMS management is considering pilot-testing, a process by which denied applicants would be allowed an opportunity to have their application reconsidered during the same coding cycle. The

9

basis for denial will be clearly delineated in a notice to the applicant and provided in a timely fashion. This pilot is expected to be introduced during the 2007 coding cycle.

**D. HCPCS Updates**

**Permanent National Codes**
The national codes are updated annually, according to the following schedule:
1. Coding requests have to be received by January 3 of the current year to be considered for the next January 1 update of the subsequent year. This means that completed requests must be received by no later than January 3 of the current year to be considered for inclusion in the January update of the following year unless January 3 falls on a weekend; then the due date is extended to the following Monday.
2. Computer tapes and instructions, that include an updated list of codes and identify which codes have been changed or deleted, are updated and sent to our contractors and Medicaid State agencies at least 60 days in advance of the January 1 implementation date for the annual update. In addition, the CMS HCPCS Workgroup's final decisions on all public requests for changes to the HCPCS coding system will be published on the official HCPCS web site at www.cms.hhs.gov/medicare/hcpcs in November of each year.

**Temporary Codes**
Temporary codes can be added, changed, or deleted on a quarterly basis. Once established, temporary codes are usually implemented within 90 days, the time needed to prepare and issue implementation instructions and to enter the new code into CMS's and the contractors' computer systems and initiate user education. This time is needed to allow for instructions such as bulletins and newsletters to be sent out to suppliers to provide them with information and assistance regarding the implementation of temporary CMS codes.

**HCPCS/Medicare Website**
Our website, http://www.cms.hhs.gov/medicare/hcpcs lists all of the current HCPCS codes, an alphabetical index of HCPCS codes by type of service or product, and an alphabetical table of drugs for which there are level II codes. The website also includes a list of applications submitted in the current coding cycle. Interested parties can submit comments regarding the agenda items to the CMS HCPCS Workgroup by sending an e-mail to CMS through this website. These comments are included as part of the Workgroup's review as it considers the coding requests.

The newly established temporary codes and effective dates for their use are also posted on the HCPCS website at http://www.cms.hhs.gov/medicare/hcpcs. This website enables us to quickly disseminate information on coding requests and decisions.

**Code Assignment Following Medicare National Coverage Determination**
Pursuant to Sec. 1862 (I) (3) (C) (iv) of the Social Security Act (added by Section 731 (a) of the Medicare Modernization Act), the Centers for Medicare and Medicaid Services (CMS), has developed a process by which the CMS HCPCS Workgroup will identify an appropriate existing code category and/or establish a new code category to describe the item that is the subject of a

10

EXHIBIT A

44

National Coverage Determination (NCD). If the item is considered Durable Medical Equipment, Prosthetic, Orthotic or Supply (DMEPOS), the CMS will defer to the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) to determine the appropriate code category. Under contract to the CMS, the SADMERC assigns individual DMEPOS products to HCPCS code categories for the purpose of billing Medicare.

As a matter of meeting on-going Medicare program operating needs, processes have existed for some time by which items and services that are newly covered by Medicare are assigned to a new or existing code category. Effective July 1, 2004, the process outlined below has been used by CMS to comply with the requirements of Sec. 1862 (l).

1. **Assignment of an Existing "Temporary" or "Permanent" Code**: When the CMS determines that an item is already identified by an existing "temporary" or "permanent" (as described in A and B above) HCPCS code category, but was previously not covered, the CMS will assign the item to the existing code category, and ensure that the coverage indicator assigned to the code category accurately reflects Medicare policy regarding payment for the item. Sec. 731 of the MMA does not require that a new code category or a product specific code be created for an item simply because a new coverage determination was made, without regard to codes available in the existing code set.

2. **Assignment of a New "Temporary" or "Permanent" Code**: When the CMS determines that a new code category is appropriate, CMS will make every effort to establish, publish, and implement the new code at the time the final coverage determination is made.

3. **Assignment of an Unclassified Code**: Under certain circumstances, the assignment of an item to an unclassified code may be necessary. A number of unclassified codes already exist under various headings throughout the HCPCS Level II code set. When an item is newly covered, but usage is narrow and the item would be billed infrequently, it may be more of an administrative burden to revise the code set than to use an unclassified code along with other, existing processing methods. When a new "temporary" or "permanent" code is appropriate, but the change cannot be implemented and incorporated into billing and claims processing systems at the time the final NCD decision memorandum is released, an unclassified code may be assigned in the interim, until a new code can be implemented, in order to ensure that claims can be processed for the item. The timing of implementation of new "temporary" or "permanent" codes relative to the date of the coverage determination depends on a variety of factors, some of which are not within the direct control of the code set maintainers, for example:

   - coding alternatives may require extensive research;
   - the timing of the coverage determination may be such that the publication deadline for the next Quarterly Update is missed
   - there is insufficient time between NCD and Quarterly Update to incorporate new codes into new policy and accompanying billing instructions, and into claims processing systems along with any edits needed to operationalize the new code.

11

EXHIBIT A

45

Rev. November 30, 2005

12

EXHIBIT A

46

Name & Address:
Robert W. Fischer, Jr. (SBN 57001)
Fulbright & Jaworski L.L.P.
555 S. Flower Street, 41st Floor
Los Angeles, CA 90071      Phone: (213) 892-9200
Attorneys for Plaintiff GORDIAN MEDICAL, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORDIAN MEDICAL, INC.<br><br>PLAINTIFF(S)<br><br>v.<br><br>KATHLEEN SEBELIUS, Secretary of Department of Health and Human Services<br><br>DEFENDANT(S). | CASE NUMBER<br><br>S A C V 1 1 - 1 5 6 6 JVS (JPRx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): KATHLEEN SEBELIUS, Secretary of Department of Health and Human Services

A lawsuit has been filed against you.

Within __60__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Robert W. Fischer, Jr._____, whose address is _Fulbright & Jaworski L.L.P., 555 S. Flower St., 41st Fl., Los Angeles, CA 90071_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**OCT 11 2011**

Clerk, U.S. District Court

Dated: _____

By: _____
       Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS**   (Check box if you are representing yourself ☐ )

Gordian Medical, Inc.

**DEFENDANTS**

Kathleen Sebelius, Secretary of Department of Health and Human Services

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Robert W. Fischer, Jr.
FULBRIGHT & JAWORSKI L.L.P.
555 S. Flower Street
41st Floor
Los Angeles, CA 90071
213-892-9200

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff       ☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No       ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Medicare appeal.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☒ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

SACV11-1566

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

VIII(a).   **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X]  No   [ ]  Yes

If yes, list case number(s):

VIII(b).   **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [ ]  No   [X]  Yes

If yes, list case number(s):   10-cv-03933 CAS (FFMx); 10--cv-01202 CAS (FFMx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   [X]  A. Arise from the same or closely related transactions, happenings, or events; or

[X]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

[X]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[ ]   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[X]   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _(signature)_   Date  October 11, 2011

   ROBERT W. FISCHER, JR.

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |